UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

DR. PHYLLIS HIGHTOWER                                              PLAINTIFF

V.                                            CIVIL ACTION NO. 3:19-CV-934-DPJ-FKB

FAMILY HEALTH CARE CLINIC, INC.                                   DEFENDANT

ORDER

Dr. Phyllis Hightower sued her former employer, Defendant Family Health Care Clinic, Inc. ("FHCC"), alleging discrimination based on her race, sex, and disability.  Specifically, she asserts claims for disparate compensation, failure to promote, hostile work environment, and wrongful termination.  While there appears to have been much conflict at FHCC, Hightower has not shown that her race, sex, or disability motivated any employment actions.  Notably, federal law "is not a general civility code for the American workplace."  *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999).  Having reviewed each claim, the Court finds that FHCC is entitled to summary judgment because Hightower's claims are unexhausted, time-barred, or meritless.

I.      Factual Background

FHCC is a health center serving underprivileged patients in three states.  Def.'s Redacted Supp. Mem. [127] at 2; Compl. [1] ¶ 9.  In October 2007, FHCC's CEO, Dr. Margaret Gray (Black female), hired Hightower, a Black female pediatrician, to work at FHCC's clinic in Rankin County, Mississippi.  Hightower Contract [126-3] at 1–2, 8.  The clinic has a diverse staff because, over the years, Gray had hired doctors identified as Black, White, and Asian.

Though Gray and Hightower are the same race and sex, Hightower says Gray repeatedly discriminated against her based on Hightower's race and sex.  For starters, Hightower claims that

Gray paid her a lower wage than male and non-Black pediatricians.  She also asserts that Gray failed to promote her to chief medical officer ("CMO") because of Hightower's race and sex, though Gray successively filled that position with two Black doctors (one male, one female).

On August 26, 2016, Hightower was hospitalized for symptoms related to her polymyositis.  Hightower Dep. [133-16] at 76–77.  She subsequently took FMLA leave. Hightower Aff. [157] ¶ 91.  While on leave, Hightower received several calls from FHCC personnel asking when she would return.  *Id.* ¶ 92.  She also visited the clinic one day, and Gray made an inappropriate comment regarding her weight.  Pl.'s Resp. to Interrogs. [126-36] at 26. Hightower claims that Gray's weight-related statement and the calls asking when she would return constitute disability harassment.

Hightower also believes Gray harassed her and eventually terminated her employment due to Hightower's race, sex, and disability.  There is no material dispute that Hightower clashed with doctors and nurses before her medical leave, prompting warnings from Gray.  That pattern continued after Hightower's October 15, 2016 return from medical leave, starting when two nurses complained to management that Hightower had been rude or was undermining their work; another doctor reported that the nurses had been crying.  *See* Gray Aff. [133] ¶¶ 27–28. Hightower also had two conflicts during this time with Dr. EE,[1] prompting FHCC investigations. *See id.* ¶¶ 29, 30.  The second investigation concluded when Gray "terminated [Hightower's] employment due to the ongoing conflicts chronically created by Dr. Hightower in the clinic."  *Id.* ¶ 32; *see also* Termination Letter [159-10].

---

[1] This Order mentions the personal information of several of Hightower's former coworkers, including salaries and disciplinary histories.  Accordingly, as to those coworkers, the Court will use their initials.

On May 25, 2017, Hightower filed an EEOC charge; she received a right-to-sue letter on September 24, 2019.  *See* EEOC Charge [157-46]; Right to Sue Letter [1-1].  On December 20, 2019, Hightower filed this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 1981; and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112.  She asserted the following claims:  Count I, race-based discrimination in compensation and promotion under Title VII; Count II, sex-based discrimination in compensation and promotion under Title VII; Count III, hostile work environment under Title VII (though the averments in this count all relate to disability and not race); Count IV, race discrimination in compensation and terms of employment under § 1981; and Count V, disability discrimination resulting in harassment and termination from employment.  The issues have been fully briefed, and the Court has both personal and subject-matter jurisdiction over this dispute.

II.     Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing

that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted).  In reviewing the evidence,

factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both

parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069,

1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make

credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 150 (2000).  It must "interpret all facts and draw all reasonable inferences in favor

of the nonmovant." *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v.*

*Cotton*, 572 U.S. 650, 660 (2014).  But conclusory allegations, speculation, unsubstantiated

assertions, and legalistic arguments have never constituted an adequate substitute for specific

facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754,

759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)); *accord Little*, 37

F.3d at 1075.

Moreover, under Rule 56(c)(1)(A), a party asserting that a fact "is genuinely disputed

must support the assertion by . . . citing to particular parts of materials in the record."  "The

court has no duty to search the record for material fact issues.  Rather, "the party opposing the

summary judgment is required to identify specific evidence in the record and to articulate

precisely how this evidence supports his claim." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857

(5th Cir. 2010) (citations omitted).  Here, the Court has endeavored to consider the whole record,

but it is immense, and the parties frequently offer no cites or cite entire documents, including

lengthy depositions.

III.    Analysis

Hightower says FHCC violated Title VII, § 1981, and the ADA.  Title VII prohibits

employment discrimination based on "race, color, religion, sex, or national origin" as to an

employee's "compensation, terms, conditions, or privileges of employment."  42 U.S.C.

§ 2000e-2(a).  Section 1981 prohibits many forms of race-based employment discrimination.

*See Bobo v. ITT, Cont'l Baking Co.*, 662 F.2d 340, 342–45 (5th Cir. 1981).  And the ADA, as its

name suggests, prohibits employment discrimination based on an employee's disability.  42

U.S.C. § 12112.

Before addressing the merits, the parties dispute whether Hightower properly exhausted

the Title VII and ADA claims and further dispute whether the failure-to-promote, hostile-work-

environment, and compensation claims are time barred.  This Order follows that same outline.

A.     Procedural Barriers

Title VII and ADA claims must be exhausted through charges filed with the EEOC, as

those statutory schemes demand that the agency's "investigatory and conciliatory procedures"

are given a chance to yield "non-judicial resolution[s]."  *Jennings v. Towers Watson*, 11 F.4th

335, 342 (5th Cir. 2021) (quoting *Patton v. Jacobs Eng'g Grp.*, 874 F.3d 437, 443 (5th Cir.

2017)).  A charge must be brought within 180 days of "the alleged unlawful employment

practice."  42 U.S.C. § 2000e-5(e)(1); *see Dao v. Auchan Hypermarket*, 96 F.3d 787, 789 (5th

Cir. 1996) (per curiam) (citing 42 U.S.C. § 12117(a)) (holding that § 2000e-5 applies to the

ADA).

Such a charge will exhaust "any kind of discrimination like or related to allegations

contained in the charge and growing out of such allegation [sic] during the pendency of the case

before the Commission."  *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)

(citation omitted); *accord McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008).

"[T]he 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation

which can reasonably be expected to grow out of the charge of discrimination."  *Sanchez*, 431

F.2d at 466.  Whether a claim falls within that scope requires a "fact-intensive analysis of the statement given by the plaintiff in the administrative charge, [] look[ing] slightly beyond its four corners, to its substance rather than its label."  *Jennings*, 11 F.4th at 342 (quoting *Patton*, 874 F.3d at 443).  *See generally Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 167 (5th Cir. 2018).

        1.      Exhaustion of Title VII Race-Based Compensation Claim

There is no dispute Hightower filed an EEOC charge expressly complaining that males were paid more than her.  EEOC Charge [126-35] at 1.  But she also stated that FHCC "subjected [her] to different terms and conditions than White Physicians," which she says should cover the race-based compensation claims.  *Id.*  This is a close call, but because the race-based compensation claims can proceed under § 1981 (and otherwise fail on the merits), the Court assumes without deciding that Hightower exhausted the claim under Title VII.[2]

        2.      Exhaustion and Timeliness of Title VII and ADA Hostile-Work Environment Claims

FHCC says Hightower's Title VII and ADA hostile-work-environment claims must be dismissed because her EEOC charge failed to mention hostile work environment and, assuming the EEOC charge could be construed to cover that claim, the charge was untimely.  *See* Def.'s Redacted Supp. Mem. [127] at 16–17, 19.

Starting with the scope of the charge, Hightower's EEOC charge form offered no box to check for hostile work environment, so she made no such notation.  *See* EEOC Charge [126-35] at 1.  She did, however, catalog grievances throughout her tenure at FHCC.  *Id.* at 2–7.  And much of what she listed would not alone be actionable as discrete ultimate employment

---

[2] EEOC exhaustion is not jurisdictional.  *Davenport*, 891 F.3d at 168.

decisions, suggesting that they could be part of a hostile-work-environment charge. *See Gates v. Lyondell Petrochemical Co.*, 227 F. App'x 409, 409 (5th Cir. 2007) (per curiam) (finding plaintiff failed to exhaust because "hostile environment . . . claim[] could not be expected to grow out of her EEOC discrimination charge when she charged only her employer's discrete acts in terminating and failing to promote her, and made no mention of a hostile work environment"). The Court assumes, without deciding, that an EEOC investigation into a hostile work environment could "reasonably be expected to grow out of the charge." *Jennings*, 11 F.4th at 342.

The timing issue is different. Because Hightower's charge was filed on May 25, 2017, any complained-of conduct must have occurred between November 26, 2016 (180 days before her EEOC charge) and November 28, 2016 (termination). FHCC contends that the sole conduct occurring in that two-day window was Hightower's termination from employment, which is not part of a hostile-work-environment claim.

To overcome that issue, Hightower relies on the continuing-violation doctrine, a federal common-law doctrine governing accrual. *Heath v. Bd. of Supervisors for S. Univ & Agric. & Mech. Coll.*, 850 F.3d 731, 740 (5th Cir. 2017). In the employment-law context, the Supreme Court has distinguished "between discrete act claims and ongoing harassment claims[:] . . . the latter, but not the former, may qualify as continuing violations." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). "Discrete acts," which form the basis for disparate-treatment claims, include acts "such as termination, failure to promote, denial of transfer, [and] refusal to hire." *Morgan*, 536 U.S. at 114. "[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Id.* at 112–13.

"Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct."  *Id.* at 115.  "The 'unlawful employment practice' therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Id.* at 117.

Here, Hightower says three events would trigger the continuing-violation doctrine:  (1) an alleged remark by CMO Dr. Charles Curry telling Hightower she should "tuck her head" around Dr. EE, a White doctor; (2) her wage-related claims; and (3) her termination from employment.  Pl.'s Opp'n Mem. [171] at 23.

Starting with the tuck-your-head comment, Hightower was unable to pinpoint when it occurred.  She testified, "I know it occurred around the time of the otoscope [incident, which occurred on November 18, 2016], most likely after that incident."  Hightower Dep. [133-16] at 174.  That is not enough to create a genuine dispute whether the conversation occurred between November 26, 2016, and November 28, 2016.  And, as to the ADA-harassment claim, the remark had nothing to do with her disability.

The compensation issues and the termination did occur within the window.  But both decisions constitute discrete acts of discrimination.  In *Estate of Martineau v. ARCO Chemical Co.*, the plaintiff claimed national-origin-based harassment and a national-origin-based termination.  203 F.3d 904, 912 (5th Cir. 2000).  The district court dismissed the hostile-work-environment claim as time barred, and the Fifth Circuit agreed, holding that the plaintiff's "termination did not qualify as an act within the time period because the termination related to

disparate treatment[,] not harassing conduct." *Id.* at 913 (rejecting continuing-violation argument).

Non-binding cases have reached similar results. *See Hartz v. Adm'rs of Tulane Educ. Fund*, 275 F. App'x 281, 288–89 (5th Cir. 2008) (per curiam) (rejecting district court holding that discrete adverse act was so "intertwined with the hostile work environment claim as to make it a component part of a larger unlawful employment practice"); *Byrd v. Huntington Ingalls, Inc.*, No. 1:14-CV-125-KS-MTP, 2015 WL 2169864, at *6 (S.D. Miss. May 8, 2015) (holding that "[d]iscrete employment actions such as termination constitute separate actionable employment practices, are different in kind from hostile environment claims, and 'do not make timely acts that fall outside the [statutory] time period'" (quoting *Morgan*, 536 U.S. at 112)). Because Hightower has not alleged any harassment within the limitations period, her Title VII and ADA hostile-work-environment claims are time-barred. [3]

> 3.   Timeliness of Failure-to-Promote Claims

Hightower asserts that Gray violated her Title VII and § 1981 rights to be free from race-based discrimination and her Title VII protection from sex-based discrimination when Gray offered the CMO position to Dr. Curry, a Black, male physician. *See* Compl. [1] Ct. 1. FHCC contends that the claims are time-barred because Hightower was on notice of Curry's appointment "at least as early as October 2015," when Hightower says Curry was introduced to her as the new "OB-GYN/CMO." Def.'s Redacted Reply [167] at 4 (citing Hightower Dep.

---

[3] Though the Court follows Fifth Circuit law, it questions whether *Morgan* supports this holding. That said, Hightower has not shown that the two acts within the statutory window (compensation and termination) were because of her race or disability. And even if the claims survived this procedural hurdle, the alleged ADA harassment was neither severe nor pervasive, and the Title VII race claim would fail for the same reasons her § 1981 claim falls short. That claim is addressed later.

[133-16] at 122–23); *see also* Hightower Aff. [157] ¶ 86.  Hightower acknowledges the delay but asserts equitable tolling.  Pl.'s Opp'n Mem. [171] at 17–21.

The Fifth Circuit has identified "three nonexclusive situations when equitable tolling may be appropriate:  '(1) the pendency of a suit between the same parties in the wrong forum; (2) plaintiff's unawareness of facts giving rise to the claim because of the defendant's intentional concealment of them; and (3) the EEOC's misleading the plaintiff about the nature of her rights." *Alvardo v. Mine Serv.*, 626 F. App'x 66, 69 (5th Cir. 2015) (quoting *Granger v. Aaron's Inc.*, 636 F.3d 708, 712 (5th Cir. 2011)).  "The party seeking equitable tolling bears the burden" of demonstrating its appropriateness.  *In re Deepwater Horizon*, No. 20-30673, 2021 WL 4888395, at *2 (5th Cir. Oct. 19, 2021) (per curiam) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

Hightower says the second situation applies because she was misled about the nature of the position (that it would be a full-time administrative role) and whether the position included compensation separate from the CMO's salary as a physician.  Pl.'s Opp'n Mem. [171] at 19–20. But "[a] court will equitably toll a limitations period only when the employer's affirmative acts mislead the employee."  *Ramirez v. City of San Antonio*, 312 F.3d 178, 184 (5th Cir. 2002) (finding that employee "pointed to no affirmative statement made by [employer] that his transfer was temporary"); *see also Rivers v. Geithner*, 548 F. App'x 1013, 1018 (5th Cir. 2013) (per curiam) (holding that employee failed to show employer "concealed facts from her or affirmatively misled her").

The closest Hightower comes to an affirmative act intended to mislead is her argument that FHCC introduced Curry to the staff "as a practicing OB-Gyn," *i.e.*, not as the CMO.  Pl.'s Opp'n Mem. [171] at 17.  Even assuming that argument would be enough, Hightower's

testimony does not support it.  According to Hightower, in late 2015, she "met Dr. Curry when he was introduced as the new chief medical officer."  Hightower Dep. [133-16] at 36; *see also* Hightower Aff. [157] ¶ 86.  Hightower has not created a question of fact whether FHCC intentionally concealed information from her.[4]

Even if Hightower had shown concealment, litigants asserting equitable tolling must diligently pursue their rights.  *Pace*, 544 U.S. at 418.  "The requirement of diligent inquiry imposes an affirmative duty on the potential plaintiff to proceed with a reasonable investigation in response to an adverse event."  *Pacheco v. Rice*, 966 F.2d 904, 907 (5th Cir. 1992).  By her own account, Hightower learned that FHCC hired Curry as the CMO in 2015.  She then waited until May 25, 2017, to file her EEOC charge of discrimination.  Hightower failed to file a timely EEOC charge regarding the promotion claim.

Hightower's § 1981 claim related to the promotion decision is likewise time-barred because she sued FHCC more than four years after learning that FHCC hired Curry for the CMO position.  *See* 29 U.S.C. § 1658.[5]

---

[4] Hightower also states that when Dr. Laurie Barnes was the acting CMO, she informed Hightower that the job did not pay.  Pl.'s Opp'n Mem. [171] at 18.  But even assuming Barnes's statements are attributable to FHCC as an act of concealment, what she said was apparently true at the time.  As Hightower notes, Barnes testified that she was not paid extra for the administrative duties.  *Id.* (citing Barnes Dep. [133-13] at 73).

[5] It is unclear whether Hightower opposed summary judgment on the § 1981 promotion claim.  *See* Pl.'s Opp'n Mem. [171] at 21, 27 ("Plaintiff can establish sex discrimination claim with regard to the failure to promote.").  If so, then § 1981's statute of limitations is not her only problem.  Because Gray hired a Black candidate for the position, Hightower has failed to make a prima facie case of race-based failure to promote.

B.      The Merits

To summarize the holdings so far, the Title VII and ADA hostile-work-environment claims, and all claims related to the alleged failure to promote, are time-barred.  All other claims will be considered on the merits.  That includes:  (1) race-based wage claims (Title VII and § 1981); (2) sex-based wage claims (Title VII); (3) wrongful-termination claims based on race (Title VII and § 1981) and disability (ADA); and (4) race-based hostile-work-environment claim (§ 1981).  The first three categories relate to discrete acts of discrimination and will be addressed first.

1.      Discrete Acts of Alleged Discrimination

Claims regarding discrete acts of alleged discrimination under Title VII, § 1981, and the ADA are all analyzed under the three-step *McDonnell Douglas* framework when the plaintiff relies on circumstantial rather than direct evidence of discrimination.  *See Johnson v. PRIDE Indus.*, 7 F.4th 392, 406 (5th Cir. 2021) (§ 1981); *E.E.O.C. v. LHC Grp.*, 773 F.3d 688, 694 (5th Cir. 2014) (ADA); *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005) (per curiam) (Title VII).

First, a plaintiff must create a genuine issue of material fact as to each element of the appropriate *prima facie* case.  *Abarca*, 404 F.3d at 941.  Second, the employer must "provide 'a legitimate, non-discriminatory reason' for the adverse employment action."  *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020) (quoting *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004)).  "The employer's burden is only one of production, not persuasion, and involves no credibility assessment."  *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007) (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)).  It will suffice if sufficiently clear "to afford the employee a realistic opportunity to show that the reason

is pretextual." *Patrick*, 394 F.3d at 317 (internal quotation marks removed).  "If the employer submits such reasons, the burden shifts back to the employee to show that those reasons are pretextual." *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 521 (5th Cir. 2021) (citation omitted).

The "'ultimate' burden of persuasion . . . 'remains at all times with the [employee],' [but] the failure of a party to meet its burden of production at each step may allow judgment against that party." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 235 (5th Cir. 2016) (quoting *Tex. Dep't Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).  Ultimately, the dispositive issue in each case is "discrimination *vel non*." *Reeves*, 530 U.S. at 143 (quoting *U.S. Postal Serv. Bd. of Gov'rs v. Aikens*, 460 U.S. 711, 714 (1983)).  To defeat a motion for summary judgment, a plaintiff must demonstrate "a conflict in substantial evidence to create a jury question regarding discrimination." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999); *accord Jones v. Gulf Coast Restaurant Grp.*, 8 F.4th 363, 369 (5th Cir. 2021); *Rite Way Serv.*, 819 F.3d at 245.

a.      Gender-Based Discriminatory Compensation (Title VII)

The only disputed element of Hightower's prima facie gender-based pay case is whether she has shown that her "circumstances are 'nearly identical' to those of a better-paid employee who is not a member of the protected class." *Mitchell v. Mills*, 895 F.3d 365, 371 (5th Cir. 2018) (quoting *Taylor v. United Parcel Serv.*, 554 F.3d 510, 522 (5th Cir. 2008)).  "In making this determination, a variety of factors are considered, including job responsibilities, experience, and qualifications." *Id.* (citing *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018)).

Although nearly identical is not equivalent with identical, "[e]mployees with different supervisors, who work for different divisions," "who were the subject of adverse employment

actions too remote in time from that taken against the plaintiff," or "who have different work responsibilities" generally are not similarly situated to the plaintiff. *Lee v. Kan. City S. Ry.*, 574 F.3d 253, 259–60 (5th Cir. 2009). Significantly, when a difference between the plaintiff and the comparator "'accounts for the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* at 260 (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)).

Here, Hightower offers a single comparator in her summary-judgment response, an unnamed male pediatrician hired in 2016 to work half time at FHCC's Water Valley, Mississippi clinic. *See* Pl.'s Opp'n Mem. [171]. Hightower claims that the comparator's salary was $78,628.63, which included $14,400.00 in rural incentive pay. *Id.* At the time, Hightower's salary was $144,276.01. *See id.* But she contends that had the male comparator worked full time, his salary would have been "$157,256.26[,] . . . substantially higher than Dr. Hightower's." *Id.*

Hightower has not identified a valid comparator for two primary reasons: First, the male pediatrician worked part time. *Cf. Morris v. Town of Independence*, 827 F.3d 396, 401, 403 (5th Cir. 2016) (holding in termination case that proffered comparator was not similarly situated, in part because plaintiff was part-time employee and comparator was full-time). Second, and more significantly, the comparator worked at a different clinic, where he was eligible for rural incentive pay. Because the circumstances were not nearly identical, Hightower has not established a prima facie case of gender-based disparate wages. Even assuming she had, FHCC

met its burden of production by citing these same differences, and Hightower failed to show that they are pretextual.  The sex-based disparate-wage claim is dismissed.[6]

   b.  Race-Based Compensation Claim (Title VII and § 1981)

  According to Hightower, FHCC paid several non-Black, subsequently hired, and less-experienced pediatricians more than she earned.  She focuses on Dr. EE (White), Dr. SW (White), Dr. AL (White), and Dr. RA (Asian).[7]  There is some overlap with the issues at each stage of the burden-shifting analysis, so, for economy, the Court will assume a prima facie case and start with FHCC's proffered reason for the disparities.

   i.  FHCC's Proffered Non-Discriminatory Justification

  FHCC offers a three-part explanation for Hightower's lesser pay.  First, the initial salaries differed because when FHCC hired Drs. AL, RA, and SW and rehired Dr. EE (who returned to the clinic in 2016), "the base salary was higher due to the increased cost of living."  Def.'s Supp. Mem. [134] at 29–30.  In other words, FHCC cites salary compression, "a condition where[,] to attract employees from outside the company, [an employer] ha[s] to pay them more to perform the same job than it pays its existing employees who have equal or more experience."  *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1001 (7th Cir. 2000).  Though not all market-force rationales are legitimate, *Brennan v. City Stores, Inc.*, 479 F.2d 235, 241 n.12 (5th Cir. 1973),

---

[6] This unnamed male was the only physician Hightower addressed in this portion of her memorandum.  As noted, "the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim." *RSR Corp.*, 612 F.3d at 857.  While the Court has addressed Hightower's lone argument, other men are addressed with respect to her race claim, but for the reasons stated next, those doctors are not viable comparators either.

[7] Hightower briefly mentions four other doctors as "valid comparators."  Pl.'s Opp'n Mem. [171] at 46.  But her arguments for them are underdeveloped, and none earned more than Hightower.  Accordingly, the Court specifically addresses Drs. AL, RA, SW, and EE.

salary compression is a "[class]-neutral explanation[]," *Kellogg v. Ball State Univ.*, 984 F.3d 525, 528 (7th Cir. 2021).  Second, Hightower's salary lost pace with inflation over time because "[i]n 2010, 2011, and 2012, no pediatrician received salary increases for cost of living or otherwise due to funding issues."  Gray Aff. [133] ¶ 8.  Third, "all physicians, starting in 2013, including Plaintiff, received cost of living increases at 2% per annum, and no pediatricians, regardless of race, received merit increases."  Def.'s Redacted Supp. Mem. [127] at 30.  In other words, subsequent adjustments were race neutral.  FHCC has met its burden of production.

ii.   Pretext

Because FHCC met its burden, Hightower must create a question whether the employer's proffered reasons are pretextual.  Generally, pretext may be suggested "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence."  *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (quoting *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010)).  Evidence tending to induce a "'factfinder's disbelief of the reasons put forward by the defendant' . . . is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."  *Reeves*, 530 U.S. at 147–48 (quoting *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).  But "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."  *Id.* at 153.

Hightower did earn less than some non-Black physicians, but their starting salaries were set three to nine years after Hightower's starting salary.  *See Kan. City S. Ry. Co.*, 574 F.3d at 259 (noting that plaintiffs subject to "adverse employment actions too remote in time . . . generally will not be deemed similarly situated"); *Mengistu v. Miss. Valley State Univ.*, 716 F.

App'x 331, 334 (5th Cir. 2018) (per curiam) (noting, among other reasons, that comparators were not nearly identical because they were hired at different times).  Also, she offers no evidence rebutting FHCC's contention that it froze wages for funding issues—causing salary compression—and then gave all pediatricians the same increases regardless of race.

Hightower responds by highlighting the salary disparities themselves and noting that many doctors with substantially less experience "were hired at salaries comparable to the Plaintiff."  Pl.'s Opp'n Mem. [171] at 24, 44–46.  But that merely satisfies her prima facie case.  Because FHCC met its burden of production, the presumption of discrimination created by the prima facie case "simply drops out of the picture," and Hightower must prove FHCC "intentionally discriminated against [her] because of [her] race."  *Hicks*, 509 U.S. at 510–11 (internal quotation marks, and citations omitted); *see also Ross v. Univ. of Tex. at San Antonio*, 139 F.3d 521, 526 (5th Cir. 1998) (finding charts showing compensation disparities "are insufficient to create a reasonable inference of age discrimination" where plaintiff failed to show pretext).

Hightower then goes further, arguing that the salary-compression "reason is belied by the fact that Dr. [LM] was offered a . . . raise one year after Dr. Hightower was hired with no corresponding raise for the Plaintiff."  Pl.'s Opp'n Mem. [171] at 44.  That is partially correct but irrelevant.  When FHCC hired Hightower in 2008, it paid her more than LM, a less-experienced, White, female doctor FHCC hired in 2006.  LM's starting salary was $111,000, Gray Dep. [133-1] at 217, and Hightower's starting salary was $135,942, Hightower Contract [126-3] at 5.  As Hightower correctly notes, FHCC gave LM a $135,716.80 contract in 2008, which was still slightly less than Hightower's salary.  LM Contract [157-5] at 4.  But, FHCC gave Hightower a

raise the following year, bumping her to $138,673.60.  *See* Hightower Personnel Change Forms [126-11] at 2.  LM apparently left the clinic.

These facts are neither disputed nor capable of rebutting FHCC's proffered non-discriminatory reasons for the different wages.  Put simply, what happened in 2008 with LM's salary is too remote in time to compare with decisions that began four years later when the wage-freeze lifted and FHCC began hiring new doctors at higher salaries.  *See Kan. City S. Ry. Co.*, 574 F.3d at 259.  The first new hire to earn more than Hightower occurred in 2012.  *See* AL Contract [133-10] at 1, 5.

Still, Hightower claims that FHCC should have given her a catch-up raise at some point. That might be a good business practice, but "employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."  *Eyob v. Mitsubishi Caterpillar Forklift Am., Inc.*, 745 F. App'x 209, 214–15 (5th Cir. 2018) (per curiam) (quoting *Riser v. Target Corp.*, 458 F.3d 817, 821 (8th Cir. 2006)).  "[T]he issue at the pretext stage is whether [the employer's] reason, even if incorrect, was the real reason for" its decision.  *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 476 (5th Cir. 2015).

Hightower offers no binding authority creating a duty for employers to adjust salaries based on protected characteristics whenever they hire new employees at higher salaries, and *Ross* at least suggests that no general catch-up duty exists. 139 F.3d at 526 (finding that plaintiff failed to prove gap between his pay and that of recent hires was based on race and further finding lack of proof that plaintiff was discriminated against when he did not receive an equity adjustment because other employees within same protected class did receive one).

Finally, Hightower contrasts the engagement letters FHCC sent her and Dr. KW, another Black pediatrician, against letters sent to non-Black doctors.  As she notes, the Hightower and KW letters did not use the term "base salary," while those sent to the referenced non-Black doctors did.  Pl.'s Opp'n Mem. [171] at 24.  But Hightower's offer letter makes clear that the salary offered would be subject to enhancements in the form of raises and incentive pay. Hightower Letter [157-2] at 1–2.  And except for one pair, letters sent to non-Black providers also varied significantly in tone and language.  *Compare, e.g.*, Dr. SW Letter [159-7], *with* Dr. AL Letter [157-3].  The excepting pair went to Drs. DH and EE, which, like the Hightower and Dr. KW letters, were sent less than a year apart.  *Compare* DH Letter [157-41], *with* EE Letter [157-12].  This is not enough to meet Hightower's burden at the pretext stage.

Because Hightower has not raised a genuine issue of material fact whether FHCC's justification for the pay disparities is pretextual, Hightower's Title VII and § 1981 discriminatory-pay claims must be dismissed.

c.      Discriminatory Discharge

Gray terminated Hightower's employment on November 28, 2016.  According to Hightower, Gray fired Hightower because she is Black and disabled, thus violating Title VII, § 1981, and the ADA.  These claims likewise employ the burden-shifting analysis, starting with the plaintiff's duty to state a prima facie case.

To establish the prima facie race-based-discharge case, "the plaintiff must show (1) that [s]he belongs to a protected minority, (2) that [s]he was qualified for the job [s]he held, (3) that despite [her] qualifications, [s]he was terminated, and (4) that [her] employer discharged [her] under circumstances that give rise to an inference of unlawful discrimination."  *Kebiro v. Denton State Sch.*, No. 93-5519, 1994 WL 242587, at *1 (5th Cir. May 27, 1994).

A plaintiff can satisfy the fourth element "[i]n work-rule violation cases [like this,] . . . by showing 'either [1] that [s]he did not violate the rule or [2] that, if [s]he did, [non-class] employees who engaged in similar acts were not punished similarly.'" *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 892–93 (5th Cir. 2012) (quoting *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995)). It is also possible that a fired employee may establish a prima facie case through proof that she was replaced by someone outside her protected class, something Hightower attempts to establish. *See Greene v. Potter*, 240 F. App'x 657, 660 (5th Cir. 2007) (per curiam) (noting replacement method for showing prima facie case in work-rule violation case).[8]

"To establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability." *LHC Grp.*, 773 F.3d at 697 (quoting *Zenor v. El Paso Healthcare Sys.*, 176 F.3d 847, 853 (5th Cir. 1993)). "In [ADA] cases involving alleged work-rule violations, plaintiffs 'may establish a prima facie case by showing either that [they] did not violate the rule or that, if [they] did, [employees outside the protected class] who engaged in similar acts were not punished similarly.'" *Lucas v. T-Mobile USA, Inc.*, 217 F. Supp. 3d 951, 957 (S.D. Tex. 2016) (quoting *Mayberry*, 55 F.3d at 1090 (quotation marks omitted)).

---

[8] Whether this option is available in a work-rule-violation case is not totally clear. *See Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980) (per curiam) (noting that "[w]ith respect to discharge for violation of work rules, the plaintiff must first demonstrate by a preponderance of the evidence either that he did not violate the rule or that, if he did, White employees who engaged in similar acts were not punished similarly"). *But see Williams v. Giant Eagle Markets, Inc.*, 883 F.2d 1184, 1192 (3d Cir. 1989) (rejecting *Green*). Because neither approach saves Hightower's claim, the Court will consider both avenues.

According to Hightower, while she was on leave, Dr. Blanche Bell told her that someone told Bell a clinic administrator said FHCC hired EE—a White, female doctor without disabilities—to replace Hightower.  Hightower Aff. [157] ¶ 92.  That testimony constitutes unredeemable hearsay within hearsay that could not be offered "in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2); *see also Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) (holding that hearsay is not competent evidence under Rule 56).

She also claims FHCC "hired Dr. [EE] to replace Dr. Hightower after receiving notice of [Hightower's] illness in September of 2016."  Pl.'s Opp'n Mem. [171].  Hightower cites no record evidence for this assertion, and it is not factually accurate.  EE signed her contract on August 4, 2016, before Hightower says FHCC learned of her disability one month later.  *See* Dr. EE Contract [133-24] at 7.

On this record, EE worked at FHCC before and after Hightower's termination.  But at the prima facie stage, "an employee 'has not been "replaced" . . .  when [her] former duties are distributed among other coworkers.'"  *Griffin v. Kennard Indep. Sch. Dist.*, 567 F. App'x 293, 294–95 (5th Cir. 2014) (per curiam) (quoting *Rexses v. Goodyear Tire & Rubber Co.*, 401 F. App'x 866, 868 (5th Cir. 2010) (per curiam)).  And Hightower has not created a fact question disputing a work-rule violation.  *See Turner*, 675 F.3d at 892–93; *see also* Pl.'s Opp'n Mem. [171] at 36 (noting that "true or not," her infractions "pale in comparison to" those of the comparators).  As to the comparators, none were sufficiently similar, for reasons discussed later.  *Turner*, 675 F.3d at 892–93.  Accordingly, the Court finds that Hightower fails to state a prima facie case.  But, even if EE replaced her, Hightower's claim still falls short.

i.       FHCC's Burden

FHCC generally says it fired Hightower due to repeated conflicts with other staff. As Dr. Gray put it, "I met with Dr. Hightower and terminated her employment due to the ongoing conflicts chronically created by Dr. Hightower in the clinic." Gray Aff. [133] ¶ 32.

(a)      Evidentiary Issues

To support its proffered non-discriminatory reason for terminating Hightower's employment, FHCC chiefly relies on an affidavit from Gray, in which she details conflicts involving Hightower. *See* Gray Aff. [133]. The affidavit also references exhibits, two of which are audio recordings of conversations involving Gray and Hightower. Resp. [126] Exs. EE, SS (Recordings). The remaining relevant exhibits are investigation reports, documenting complaints regarding Hightower. *See* Gray Aff. [133] at 12–13, 24–29, 30–31, 32–38, 39–45, 46–49, 50, 51–58 (Attachs. 1, 3, 4, 5, 6, 7, 8, 9—Investigative Reports). Most reports include FHCC's findings and the corrective action subsequently taken; many also contain summaries of conversations, most of which involve Gray and Hightower. *Id.*

Hightower argues that the Court must strike, or otherwise disregard, Gray's affidavit because it is not based on personal knowledge, contains "rank hearsay" and "hearsay within hearsay," or is otherwise inadmissible. Pl.'s Opp'n Mem. [171] at 40–41. At the second stage of the burden-shifting analysis, "the defendant must clearly set forth, *through the introduction of admissible evidence*, the reasons for [its decision]." *Turner*, 675 F.3d at 900 (quoting *Burdine*, 450 U.S. at 255) (emphasis added). "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical and Transp., L.L.C.*, 859 F.3d 353, 355–56 (5th Cir. 2017) (quoting 11

Moore's Federal Practice–Civil ¶ 56.91 (2017)).  In the summary-judgment context, an objection that a fact is not supported by admissible evidence is really an objection that the "fact cannot be presented *in a form* that *would be* admissible in evidence."  Fed. R. Civ. P. 56(c)(2) (emphasis added).

To begin, affidavits are admissible at the summary-judgment stage, and Hightower does not appear to argue otherwise.  Fed. R. Civ. P. 56(c)(1)(A).  As for Gray's statements regarding the proffered reasons for the termination, Gray was the decisionmaker, and her statements explaining her own acts are based on personal knowledge and are not otherwise hearsay.

In addition, "[a] statement is not hearsay if it is offered to prove the statement's effect on the listener."  *Chevron Oronite Co. v. Jacobs Field Servs. N. Am., Inc.*, 951 F.3d 219, 228 (5th Cir. 2020) (quoting *United States v. Reed*, 908 F.3d 102, 120 (5th Cir. 2018)); *cf. United States v. Sosa*, 897 F.3d 615, 623 (5th Cir. 2018) ("[T]here is not a hearsay or confrontation problem when the evidence is not being used for the truth of the matter asserted." (internal citations removed)).  So, to the extent Gray swore that she relied on the out-of-court statements listed in her affidavit and in the exhibits, they would not constitute hearsay.  For this reason alone, the evidentiary objections would not alter the outcome of this case.  Moreover, Hightower's own statements reflected in those documents are not hearsay.  *See* Fed. R. Evid. 801(d)(2)(A).  Nor has Hightower shown that FHCC could not establish at trial a business-record exception for the attached exhibits under Federal Rule of Evidence 803(6).  *See* Fed. R. Civ. P. 56(c)(2).  Lastly, Hightower herself relies on some of the same documents.

Hightower finally says the audio recordings of her conversations should be excluded because they were made without her consent.  Pl.'s Opp'n Mem. [171] at 40–41.  But, in federal-question cases, "evidence obtained in contravention of state law is admissible in federal court, so

long as no federal law is thereby violated." *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003).  And the federal wiretap law dictates that "[i]t shall not be unlawful," barring criminal or tortious intent, "for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent."  18 U.S.C. § 2511(d).  The audio recordings are likewise part of the competent summary-judgment record.[9]

(b)      FHCC's Justifications

FHCC's Handbook states:  "As an employee of FHCC you are expected to be kind, courteous, and considerate [to] fellow coworkers at all times . . . .  [A]s an FHCC employee, you should make efforts to comport with the ideals set forth in FHCC's Code of Conduct."  FHCC Personnel Handbook [126-47] at 12.  "[B]ehavior problems or policy violations are addressed through verbal counseling, written warnings, suspension or probation, and if the previous steps are unsuccessful, could ultimately result in termination."  *Id.* at 18.

FHCC says Hightower repeatedly violated these policies—despite verbal warnings—and that her termination from employment had nothing to do with race or disability.  Def.'s Redacted Supp. Mem. [134] at 5–13.  In her affidavit, Gray recalls the following incidents:

- In October 2012, a nurse complained that Hightower was spreading rumors that the nurse's husband was physically abusing her.  Gray Aff. [133] ¶ 11.  Gray gave Hightower a verbal warning about the "need [for] a healthy environment" and warned that "[n]o further incidents of this will be tolerated."  *Id.*

- In June 2015, Hightower and SW had a few altercations.  As discussed below, the two doctors gave conflicting accounts about what happened.  *Id.* ¶ 22.  Both were warned, and an investigation followed.  *Id.*

---

[9] Even if state law were to apply, Mississippi has a one-party-consent rule.  Miss. Code Ann. § 41-29-531(e) (2013) (exempting parties to a conversation from criminal and tortious liability for intercepting communications).

24

- In October 2015, SW reported a confrontation with Hightower resulting in a verbal warning to both physicians. *Id.* ¶ 22.

- In December 2015, a nurse requested a transfer because she could not work with Hightower. *Id.* ¶ 23.

- On February 26, 2016, RA complained to Gray about Hightower causing stress in the clinic. *Id.* ¶ 24.  He filed another complaint in March 2016. *Id.* ¶ 25.

- In June 2016, a nurse complained that Hightower was rude and then complained again when Hightower approached her wanting to know why she had reported her. *Id.* ¶ 26.  Hightower received another verbal warning that was recorded. *Id.*

- On November 9, 2016, a nurse reported that Hightower was rude and that it was difficult to work in pediatrics because of her. *Id.* ¶ 27.

- Later that same day, a different nurse complained that Hightower was undermining her ability to work. *Id.* ¶ 28.  And that same afternoon, RA reported that the two nurses who filed the complaints were crying. *Id.*  Hightower was again counseled. *Id.*

- On both November 16 and 18, 2016, Hightower clashed with EE. *Id.* ¶¶ 29–30. On the latter occasion, EE complained that Hightower "confronted her in a hostile manner." *Id.* ¶ 30.

- On November 22, 2016, Hightower allegedly gave a nurse under EE's supervision an order that conflicted with her duties to EE. *Id.* ¶ 31.

"An employee's inability to get along with coworkers, [her] difficulty with [inter]personal relations, and complaints about an employee from her peers or subordinates are legitimate, nondiscriminatory reasons for termination of employment." *Carroll v. Sanderson Farms, Inc.*, No. H-10-3108, 2012 WL 3866886, at *10 (S.D. Tex. Sept. 5, 2012) (citing *Strong v. Univ. Healthcare Sys.*, 482 F.3d 802, 805–06 (5th Cir. 1997) (management's receipt of numerous complaints about a nurse from coworkers and patients was a legitimate, nondiscriminatory reason for discipline and discharge); *Crouch v. J.C. Penney Corp.*, 337 F. App'x 399, 402 (5th Cir. 2009) (employee complaints about manager's rude and unprofessional manner satisfied employer's burden)).  FHCC has met its burden.

25

ii.        Pretext

Hightower never directly disputes all alleged work-rule violations. *See* Pl.'s Opp'n Mem. [171] at 36. But she argues that FHCC's reason is a mere pretext for discrimination. With one exception, her arguments apply to both the race- and disability-based discharge claims. The final argument contends that a disability-related statement by Gray, the decisionmaker, evidenced pretext. This Order addresses her more significant points, starting with those that apply to both race and disability.

(a)       Hightower's Production

Hightower often notes that she was the hardest-working and most-productive doctor FHCC employed, and she asks, "How much chaos could you cause [while] earning your employer nearly $775,000 in your year of termination?" *Id.* That misses the point. "[T]he issue at the pretext stage is whether [the employer's] reason, even if incorrect, was the real reason for [the plaintiff's] termination." *Goudeau*, 793 F.3d at 476. Even high-producing employees can be fired, provided the decision is not based on a protected characteristic.

(b)       No Prior Warnings

Hightower argues that she "was unaware that there was a problem with her interactions with staff until November 28, 2016[,] when she was called into Dr. Gray's office and terminated." Pl.'s Opp'n Mem. [171]. That argument directly conflicts with the unrebutted recorded evidence, including the audio recording of verbal warnings Gray gave Hightower in June 2016.

According to Gray's sworn declaration, she initiated the June 2016 meeting after learning that Hightower confronted a nurse who had complained about Hightower to the administration. *See* Gray Aff. [133] ¶ 26. On the recording, Gray repeatedly insists that a healthy work

environment is required, saying, "There's got to be a way [for you] to communicate with people [without] having run ins."  Resp. [126] Ex. EE (06/13/2016 Recording) at 00:08:10–00:08:17. Gray expresses her concern that without a change in behavior, FHCC would "continue to have turnover," saying, "We have to focus on how can we keep . . . nurses from leaving. . . .  They are telling me that . . . the environment that they are working in is why they're leaving."  *Id.* at 00:12:48–00:12:55, 01:08:21–01:08:47.  Gray tells Hightower that reporting issues to supervisors in lieu of direct confrontations with coworkers would "keep you out of the line of fire."  *Id.* at 00:58:11–00:58:14.

On the recording, Hightower disputes whether the working environment caused the departures, *see id.* at 01:10:07–01:10:11, but she also assures Gray that she will follow Gray's instructions, promising, "If there is anything that comes up, then I'm just going to tell [Business Manager Dock] Graves. . . .  That's what I'm going to do," *id.* at 06:00–06:30.  Gray openly considers placing Hightower on administrative leave, but Hightower reiterates, "I'm going to follow your advice."  *Id.* at 1:06:39–1:06:42.  Gray responds, "If you can promise [that], then you can go back to work today."  *Id.* at 1:06:42–1:06:47.  Nonetheless, Gray states in her affidavit that she learned of five subsequent staff complaints concerning Hightower—all in November 2016.  *See* Gray Aff. [133] ¶¶ 27–31.

In short, the audio recording confirms that FHCC counseled Hightower regarding these same-type work-rule violations before the final conflicts that led to her termination.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380

(2007).  No reasonable juror who hears the recording could conclude that Hightower was never warned.

(c)      Similarly Situated Coworkers

Hightower says others did worse but were treated more favorably.  Pl.'s Opp'n Mem. [171] at 48–49.  To be probative evidence of pretext, alleged disparate treatment must have taken place under "nearly identical" circumstances.  *Taylor v. Peerless Indus.*, 322 F. App'x 355, 365–66 & n.6 (5th Cir. 2009) (per curiam) (quoting *Perez v. Tex. Dep't of Crim. Just.*, 395 F.3d 206, 213 (5th Cir. 2004)).

This is the same inquiry that applies when assessing the validity of a proffered comparator in the prima facie case.  *See supra* Section III.B.1.b.i; *cf. Garcia v. Pro. Contract Servs.*, 938 F.3d 236, 244 (5th Cir. 2019) (defining the inquiry, in the pretext context, by reference to the prima facie analysis of *Lee v. Kansas City Southern Railway Co.*).  In the work-rule-violation context, Hightower must show that a similarly situated employee was treated more favorably despite conduct of "comparable seriousness."  *Kan. City S. Ry.*, 574 F.3d at 261 (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)).  That is, "[i]f the difference between the plaintiff's conduct and that of [the alleged comparators] *accounts for* the difference in treatment received from the employer," the circumstances are not nearly identical.  *Id.* at 260 (emphasis added) (quoting *Wallace*, 271 F.3d at 221).  Hightower asserts that, far from accounting for the disparate treatment, the difference in conduct between her and her comparators demonstrates that Gray terminated her employment due to her race and disability.[10]

---

[10] "As the Supreme Court has instructed, the similitude of employee violations may turn on the 'comparable seriousness' of the offenses for which discipline was meted out . . . ."  *Kan. City S.*

(1)     Dr. DH (White/Non-Disabled)

Hightower points to FHCC's alleged insufficient response to several incidents involving

DH, a dentist hired in 2011.  *See* DH Opportunity Letter [157-41] at 1.  DH's supervisor at

FHCC was Dr. Barnes, a Black woman.  She testified that DH committed several workplace

infractions during his time at FHCC:  He once "pushed [her] out of the way" while they were

both seeing a patient; after a "tragedy," he showed up to work "impaired"; he  wrote pain-

medication prescriptions for adults, including family members, despite the fact that he was "not

supposed to be seeing adult patients"; and he once showed up to work and immediately left,

leaving "patients that were literally waiting in the lobby."  Barnes Dep. [133-13] at 35–37.  A

few days later, FHCC placed him on administrative leave.  DH Termination Letter [157-43] at 1–

2.  And by the end of the week, FHCC terminated his employment.  *Id.*  Because FHCC fired

both Hightower and DH, they appear to have been treated the same, which undermines

Hightower's case.  *See Heggemeier v. Caldwell Cnty.*, 826 F.3d 861, 868 (5th Cir. 2016)

(affirming dismissal and noting that employer treated plaintiff and comparator "the same—both

---

*Ry.*, 574 F.3d at 261 (quoting *McDonald*, 427 U.S. at 283 n.11).  The Fifth Circuit suggested, in
an unpublished opinion, that even more serious conduct must still be sufficiently similar.  *See
Bouie v. Equistar Chems. LP*, 188 F. App'x 233, 237 (5th Cir. 2006) ("[Plaintiff] acknowledges
that the white employees who were not discharged for violations of protocols allegedly more
serious than his were not engaged in misconduct nearly identical to his.").  And some district
courts have held that if the conduct is more serious, it is not nearly identical.  *See, e.g.*, *Moore v.
Angus Chem. Co.*, No. 07-0415, 2008 WL 4491592, at *5 (W.D. La. Oct. 1, 2008) (holding that
more serious misconduct is inherently not nearly identical conduct); *McNeal v. Kan. City S. Ry.
Co.*, No. 05 CV 0791, 2007 WL 3010201, at *2 (W.D. La. Oct. 12, 2007).  But others have taken
a different approach.  *See Johnson v. Miss. Power Co.*, No. 3:13-CV-798-TSL-JMR, 2014 WL
1153711, at *4–5 (S.D. Miss. Mar. 21, 2014) (finding that terminated plaintiff who pointed to
coworkers retained despite their "more egregious" misconduct had "clearly alleged the elements
of a *prima facie* case").  Here, Hightower says the comparators all engaged in more egregious
conduct.  If true, that might mean their circumstances were not nearly identical.  But the Court
need not go that far in this Order because Hightower has not otherwise shown nearly identical
circumstances.

lost their jobs during a reduction in force" (citing *Washington v. Louisiana*, 628 F. App'x 914, 918 (5th Cir. 2015))).

Regardless, DH was not similarly situated for at least three reasons.  First, DH was a dentist, not a pediatrician, and Hightower has not demonstrated that the positions should be treated the same.  Second, their violations differed.  Third, the two did not have similar violation histories—nowhere does Hightower suggest that DH had the same extensive record of complaints from coworkers.  Therefore, FHCC's treatment of DH is not probative.

(2)     Dr. SW (White/Non-Disabled)

Hightower alleges that Dr. SW received no discipline despite separate occasions where she "grabbed [Hightower's] arm, threatened to knock her down, [and] slammed a computer near her hands."  Pl.'s Opp'n Mem. [171] at 51.  She also claims that SW evaded punishment despite violating HIPAA.

Starting with the computer incident, FHCC notes that the story presented in Hightower's memorandum and affidavit deviates from her deposition testimony.  Def.'s Reply [175] at 13 n.26.  There, she recalled, "I was sitting at the desk writing, and [SW] threw her books on the desk and almost hit my hand . . . .  She was getting ready to go in the exam room, so I imagine she didn't want to carry the books with her in the exam room."  Hightower Dep. [133-16] at 124–25; *accord id.* at 122 ("She threw books on the desk.").  To the extent Hightower's affidavit contradicts her testimony, "the nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony." *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984).  As described in Hightower's testimony, the incident does not seem overly probative, even when added to the other SW incidents.

The other alleged physical altercation between Hightower and SW is more serious.  Gray recalls in her affidavit that the conflict began when Hightower gave an order to a nurse assigned to SW.  Gray Aff. [133] ¶ 22.  As Hightower attempted to walk away from the conversation, SW claimed that she "barely touched" Hightower's arm, while Hightower claimed that SW grabbed her so hard it tore Hightower's lab coat.  *Id.*  After meeting with FHCC administration, SW subsequently reported having found Hightower sitting in SW's office chair.  *Id.*  SW asked Hightower to move SW's purse from another chair to the desk drawer, which Hightower claimed was harassment.  *Id.*  Gray says she gave Hightower and SW "verbal counseling," Gray Aff. [133] ¶ 22, which FHCC characterizes as a form of "the first step in [FHCC's] disciplinary process," Def.'s Reply [175] at 14 & n.30 (quoting FHCC Policies [126-47] at 19).  But "[d]uring the ongoing investigation, Dr. [SW] went on medical leave and did not return."  Gray Aff. [133] ¶ 22; *see also* Def.'s Supp. Mem. [134] at 8.

According to Hightower, Gray treated her worse than SW because Gray questioned her about the altercation but not SW and then "refused to even investigate."  Pl.'s Opp'n Mem. [171] at 51; *see also id.* at 6.  She supports the argument by citing Gray's entire deposition and FHCC's EEOC response.  But both exhibits contradict Hightower's factual argument.  First, Gray testified that FHCC did speak with both Hightower and SW.  Gray Dep. [133-1] at 126–27.  And FHCC indicated the same in its EEOC response, noting SW's description of the altercation and stating that "Gray warned both doctors that acting unprofessionally was unacceptable behavior."  FHCC EEOC Resp. [157-33] at 3.

In addition to those exhibits, Gray's affidavit confirms a meeting with SW, Gray Aff. [133] ¶ 22, which she supports with an incident report stating, "Dr. Hightower and Dr. [SW] were told to communicate any concerns of the other to the Chief Medical Officer during the

meetings.  They agreed," Incident Report [133] at 24.  Hightower's argument that Gray refused

to investigate or meet with SW is not factually supported.

Nor is Hightower's contention that she was treated more harshly than SW.  Hightower

states that she was fired but SW was not.  But the undisputed record evidence demonstrates that

FHCC was still investigating this incident when SW permanently left her job.  Gray Dep. [133-1]

at 127; Gray Aff. [133] ¶ 22.  Because SW left before the investigation concluded, any

suggestion that SW would have kept her position is mere conjecture.  More to the point, because

she never returned, she was not similarly situated.

Hightower also claims that SW had other disciplinary issues that should have resulted in

termination, like an apparent HIPAA violation.  But Gray testified that FHCC was also

investigating that incident when SW took FMLA leave and that FHCC blocked SW from its

system to prevent access to its records in the interim.  Gray Dep. [133-1] at 123–24; *see also*

Dec. 2015 Curry Report [159-8] at 1 (indicating on-going investigation after leave began).

Again, the ultimate outcome is unknowable and distinguishable.

At bottom, SW is not a valid comparator.  SW quit before FHCC could determine what

actions to take for two serious violations; her violation history was not as extensive as

Hightower's history; no nurse had ever complained to Gray that SW had mistreated them; and

while SW did have a conflict with another doctor, it was Hightower herself, who also had

complaint-generating conflicts with several other doctors and nurses.  *See Luna v. Corr. Corp. of

Am.*, 469 F. App'x 301, 304 (5th Cir. 2012) (holding that employee with "almost three times

more" work-rule violations was not similarly situated to proffered comparators).  SW's treatment

did not occur under nearly identical circumstances as Hightower's, and it is not probative of

pretext.

(3)    Dr. RA (Asian/Non-Disabled) and Dr. EE
(White/Non-Disabled)

These purported comparators are best viewed together.  Hightower states that in 2017,

"Dr. [EE] and Dr. [RA] had conflicts in front of patients for which neither was terminated or

disciplined."  Pl.'s Opp'n Mem. [171] at 7.  "[T]here are additional records of [EE] barging into

[RA's] office at least four times[;] [EE] telling nurses not to follow [RA's] orders and parents to

ignore [RA's] recommendations[;] . . . [and] [EE] and [RA] engaging in a shouting match and

having to be physically separated in the clinic."  *Id.* at 37.  Hightower also describes EE as rude,

citing emails EE drafted and information obtained when EE's references were checked.  *Id.* at

36.  Finally, she cites a May 2017 memo regarding EE's failure to see patients.  *Id.*

Contrary to Hightower's argument, the record indicates that FHCC found both RA and

EE to be at fault and counseled them for inappropriate conduct—the same action taken when

Hightower conflicted with RA and SW.  Report on RA-Hightower Conflict [157-40] at 1.

Counseling is a form of discipline under FHCC's policies.  *See* FHCC Policies [126-47] at 19.

And while neither RA nor EE were terminated from employment, their overall situations were

not nearly identical to Hightower's.  RA and EE clashed, but Hightower had far more conflicts

that generated complaints from doctors and nurses alike.  *See Luna*, 469 F. App'x at 304.  Gray

never received a complaint from a nurse regarding mistreatment by EE or RA, Gray Aff. [133] ¶

35, and an argument between two doctors is not the same as alleged mistreatment of subordinate

employees.  Because RA and EE had dissimilar violation histories from Hightower, their

circumstances are not probative.

(4)     Other Allegations

Hightower also compiles a laundry list of other alleged misdeeds by her FHCC

coworkers, but this Order has focused on her most relevant evidence.  That said, the other

purported violations are likewise distinguishable, and the other employees do not share

Hightower's history.  As noted, "employment-discrimination laws have not vested in the federal

courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the

business judgments made by employers, except to the extent that those judgments involve

intentional discrimination."  *Eyob*, 745 F. App'x at 214–15.  Gray stated in her affidavit that she

had "never received any complaints from nurses about Dr. [EE], Dr. [RA], or Dr. [SW] about

their acting rudely to [the nurses] . . . or making [the nurses] cry or trying to undermine [the

nurses'] training."  Gray Aff. ¶ 35.  At bottom, the record reveals no employee with a

comparable track record who was not terminated.

(d)     Dishonesty Before EEOC

Hightower says FHCC lied to the EEOC when it claimed that "no less than 14 nurses and

or paraprofessionals quit or transferred because of Dr. Hightower."  Pl.'s Opp'n Mem. [171] at

47 (citing FHCC EEOC Resp. [157-33]).  She asserts that these statements are unsupported and

conflict with FHCC's position in this case.  "A jury may view 'erroneous statements in [an]

EEOC position statement' as 'circumstantial evidence of discrimination.'"  *Burton v. Freescale*

*Semiconductor, Inc.*, 798 F.3d 222, 237 (5th Cir. 2015) (quoting *Miller v. Raytheon Co.*, 716

F.3d 138, 144 (5th Cir. 2013)).

In its EEOC Response, FHCC said "Hightower was a disruptive employee who caused

multiple employees to leave their employment with FHCC[,] and [she] was unable to get along

with her coworkers."  FHCC EEOC Resp. [157-33] at 2.  It also stated that "[d]uring Dr.

Hightower's employment, numerous employees resigned from FHCC.  During exit interviews of these employees[,] *many* stated that they resigned their employment at FHCC or requested to be reassigned due to Dr. Hightower's behavior, including twelve employees [sic]."  *Id.* (emphasis added).  FHCC made a similar claim in response to Hightower's Interrogatory No. 9, identifying employees "who resigned . . . or requested to be reassigned due to Plaintiff's behavior."  Def.'s Initial Resp. to Interrogs. [31-3] at 9–10.

Hightower says this is inconsistent with the record evidence.  Specifically, she identifies four exit-interview checklists, two resignation letters, and one termination letter in which the individuals did not "list[] Dr. Hightower as their reasons for leaving or transferring."  Pl.'s Opp'n Mem. [171] at 47.  For the most part, Hightower correctly notes that these documents do not mention her, though one resignation letter did recount an old conflict with Hightower and noted that Hightower or another employee must "be moved," or "the problems that the clinic ha[s] will always be there."  Exit Rs. [159-11] at 7.

As to the exit-interview checklists, these records are not transcripts, but, rather, single-page forms, providing a single line to answer the question "What did [the interviewee] dislike about [his or her] job?"  *See, e.g.*, *id.* at 1.  True, none of the records specifically mention Hightower (or any other provider).  But they all report unhappiness with FHCC's conflict-prone environment.  *E.g.*, *id.* (objecting to "confrontational environment"); *id.* at 3 (complaining about "petty conflicts"); *id.* at 4 (objecting to "lack of teamwork[] and the negative socialization among coworkers"); *id.* at 5 (noting that some coworkers were unable to "work together").

The Court recognizes that it is hard to prove a negative, but the absence of Hightower's name in these records does not mean she was never mentioned during those exit interviews.  And, notably, the concern that Hightower was contributing to staff turnover, as stated in the

EEOC response, is consistent with Gray's recorded, verbal warning to Hightower in June 2016, five months before her employment ended.  Resp. [126] Ex. EE (06/13/2016 Recording) at 00:12:48–00:12:55, 01:08:21–01:08:47.

That said, it is not clear how many people complained about Hightower or how many complaints FHCC reported to the EEOC.  Assuming *arguendo* that FHCC exaggerated the number in its response, that could potentially offer "circumstantial evidence of discrimination." *Burton*, 798 F.3d at 237.  But even in cases where the Fifth Circuit "has focused on *inconsistent* rationales" provided in EEOC responses—not the case here—"there has been otherwise strong evidence of pretext." *Bennett v. Consol. Gravity Drainage Dist. No. 1*, 648 F. App'x 425, 430 (5th Cir. 2016) (emphasis added) (finding no evidence of pretext beyond alleged inconsistencies with EEOC response).

Here, the alleged exaggeration requires conjecture.  Moreover, FHCC has consistently cited Hightower's staff conflicts and the resulting impact on retention of other employees. Unlike some cases, there is no evidence that FHCC crafted its rationale after the termination decision was made. *See, e.g.*, *Burton*,798 F.3d at 235–37 (holding that employer's "shifting 'examples' of poor performances necessarily indicate[d] pretext").  Here, Gray discussed the very reasons for the termination with Hightower five months *before* her termination from employment, and FHCC then backed up its rationale with unrebutted record evidence proving Hightower clashed with coworkers as it told the EEOC.

So, even assuming FHCC did exaggerate before the EEOC, it is, at best, a scintilla pretext evidence.  *Cf. Arrington v. Sw. Bell Tel. Co.*, 93 F. App'x 593, 598–600 (5th Cir. 2004). That is not enough.  "[A] party cannot defeat summary judgment with conclusory allegations,

unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little*, 37 F.3d at 1075).

As a final note on the race-based-termination claim, Dr. Gray hired and fired Hightower. This triggers the same-actor inference, which "arises because '[c]laims that employer animus exist in termination but not in hiring seem irrational[,]' it hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job.'" *Fitzpatrick v. Pontotoc County*, 612 F. App'x 770, 776 n.5 (5th Cir. 2015) (per curiam) (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1999), *abrogated on other grounds by Reeves*, 530 U.S. 133); *see Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 421–22 (5th Cir. 2009) (emphasizing that presumption is rebuttable).

And, both Gray and Hightower are Black women. "The fact that the actor involved in both employment decisions is also a member of the protected class only enhances the inference." *White v. Omega Protein Corp.*, 226 F. App'x 360, 362 (5th Cir. 2007) (quoting *CSC Logic*, 82 F.3d at 658). Hightower has not offered sufficient evidence to rebut the inference. *See Kobaisy v. Univ. of Miss.*, 624 F. App'x 195, 199 (5th Cir. 2015) (affirming summary judgment and noting that district court correctly applied same-actor inference).

(e)    Comments on Hightower's Disability

Hightower highlights three comments made to her (by three speakers) related to her disability and leave. Certain work-place statements can establish direct evidence of discrimination, but Hightower has not argued that these statements constitute direct evidence, nor could she. "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993).

Comments reflecting discriminatory animus can also constitute indirect evidence of discrimination as "just one ingredient in the overall evidentiary mix." *Goudeau*, 793 F.3d 475; *see also id.* at 477. "In indirect[-]evidence cases, . . . the plaintiff must show that the comments involve '(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker.'" *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 457–58 (5th Cir. 2019) (quoting *Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 236 (5th Cir. 2015)). Here, Gray terminated Hightower's employment, and Hightower never suggests that the other speakers had influence or leverage over Gray's decision. Therefore, the Court will examine only Gray's comment for discriminatory animus.

In September 2016, while still on FMLA leave, Hightower returned to FHCC to drop off her return-to-work documentation. Hightower Dep. [133-16] at 180–82. As detailed in her response to an FHCC interrogatory, "Dr. Gray, the CEO, stated that she would have to send me to 'boot camp[.]' . . . I did have weight gain as a result of the steroid use which can also make you look bloated and heavier. My assumption was that this was in reference to my weight." Pl.'s Resp. to Interrogs. [126-36] at 26.

FHCC neither denies Gray's comment nor explains its context. In fairness, Hightower's memorandum does not press this argument—it discusses Gray's comment only in the statement of the facts, Pl.'s Opp'n Mem. [171] at 10, and when arguing that the ADA claim is timely, *id.* at 11. And while Gray's statement seems to be an inappropriate comment on Hightower's weight, Hightower makes no effort to explain how it reveals "discriminatory animus" as to Hightower's actual disability. It also occurred before Gray received additional complaints about Hightower's conduct.

When responding to a motion for summary judgment, the non-movant generally "must identify specific evidence in the record and articulate the manner in which that evidence supports [his] claim." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) (quoting *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004)). Hightower has not done that.[11]

A few final points are appropriate as to both the race and disability termination claims. First, Hightower disagrees with the complaints Gray received against her and Gray's handling of them. But again, "[t]he issue at the pretext stage is whether [Gray's] reason, even if incorrect, was the real reason for [Hightower's] termination." *Goudeau*, 793 F.3d at 476 (quoting *Sandstad*, 309 F.3d at 899). Hightower has not shown otherwise. Second,

> A decision as to whether judgment as a matter of law is appropriate ultimately turns on "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."

*Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003) (quoting *Wallace*, 271 F.3d at 220). Here, Hightower failed to establish a prima facie case, though the Court alternatively considered the full record. At the very best, her prima facie case is weak. And there is simply no evidence from which a reasonable fact finder could conclude that Gray—a Black woman who hired Hightower, hired other Black doctors, and consistently placed Black doctors in supervisory positions— terminated Hightower's employment because she is Black. Nor is there evidence showing that

---

[11] Hightower has not rebutted FHCC's stated reasons for her termination, and in *Wallace v. Methodist Hospital Systems*, the Fifth Circuit held: "In light of Wallace's failure to rebut each of the reasons Methodist proffered, the comments of Schmitz and Hahus must satisfy the test" for direct evidence. 271 F.3d at 222. The comments Hightower cites do not satisfy that test. *See CSC Logic*, 82 F.3d at 655.

the history of complaints leading to the termination from employment was a pretext for disability discrimination.  FHCC's motion for summary judgment is granted as to the termination claims.

2.      Hostile-Work-Environment Claim

Because the Title VII and ADA claims are time barred, Hightower's last remaining claim is her § 1981 race-based hostile-work-environment claim.  Section 1981 applies the same standards as Title VII.  *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005).

"A hostile work environment exists when the 'workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'"  *Johnson*, 7 F.4th at 399 (quoting *Harris*, 510 U.S. at 21).  To prevail on a hostile-work-environment claim,

> a plaintiff must prove he (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on his membership in the protected group; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Id.* at 399–400 (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

There is no dispute Hightower belongs to a protected class, but FHCC primarily disputes whether the alleged harassment was based on race and sufficiently severe or pervasive.

> Harassment is sufficiently "severe or pervasive enough" to create a hostile work environment when it is "objectively hostile or abusive"—meaning "an environment that a reasonable person would find hostile or abusive"—and is subjectively perceived by the victim as abusive. . . .  The objective inquiry . . . requires that the court consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." "[N]o single factor is required."

*Id.* at 400 (quoting *Harris*, 510 U.S. at 21, 23); *see also Septimus v. Univ. of Hous.*, 399 F.3d 601, 611 (5th Cir. 2005) ("Whether an environment is hostile or abusive depends on the totality of the circumstances, including factors such as the frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." (citing *Harris*, 510 U.S. at 21–22)).

When Hightower addressed the merits of her hostile-work-environment claim, she highlighted the following alleged acts of harassment:  (1) an alleged assault and intimidation by SW (White, female pediatrician); (2) FHCC's failure to address the SW complaints; and (3) hyper scrutiny by RA, a fellow pediatrician described as Asian.  Pl.'s Opp'n Mem. [171] at 50–51.  Elsewhere in her memorandum, Hightower mentioned other alleged acts of harassment, including a claim that she was told to "tuck her head [around EE]," *id.* at 23, and her wage and termination claims.  This Order will examine the acts she included in her hostile-work-environment argument and the most significant acts found in other parts of her memorandum, considering whether they are factually supported, and, if so, whether they reflect race-based harassment.  Those that pass the first two inquiries will be collectively examined to determine whether the harassment was sufficiently severe or pervasive.

The only allegations of "physically threatening" conduct are those related to SW. *Johnson*, 7 F.4th at 400.  Hightower says SW slammed a computer down near her hand, told her to get out of the way or she would knock her down, and assaulted Hightower by forcefully grabbing her arm.  Pl.'s Opp'n Mem. [171] at 50.  She also says Gray subjected her to race-based harassment because SW's conduct "went undisciplined and [she] retained her employment."  *Id.*

As previously noted, the testimony regarding the computer-slamming incident is more innocuous than Hightower's legal arguments acknowledge.  The alleged assault and threat to knock Hightower down are more serious, but SW was a coworker, and Hightower has not rebutted Gray's testimony that SW was counseled and under investigation when she quit.  *See* Gray Dep. [133-1] at 126–27; Gray Aff. ¶ 22.  Thus, Hightower has not factually supported her claim that Gray harassed her by allowing SW to go "undisciplined and retain[] her employment." Pl.'s Opp'n Mem. [171] at 50.

In addition, Hightower has not shown that the SW incidents were based on race. Hightower offers no race-based comments from SW or other evidence of racial animus by SW. Indeed, the incident report Hightower submitted with her response regarding the alleged assault reflects no claims of racial harassment.  Oct. 20, 2015 Incident Report [157-31] at 1.  At most, Hightower argues that SW is a "white woman."  Pl.'s Opp'n Mem. [171] at 51.  But that fact fails to establish a race-based hostile work environment because the law "does not protect employees from hostile conduct that is not based on their protected status."  *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 n.2 (5th Cir. 1996).  In other words, "[p]oor treatment without more is not sufficient to show harassment *based on race*, even if [the plaintiff] believes race to be the motivating factor for the poor treatment."  *Eaton-Stephens v. Grapevine Colleyville Ind. Sch. Dist.*, 715 F. App'x 351, 356 (5th Cir. 2017) (per curiam) (emphasis added); *see Baker v. FedEx Ground Package Sys. Inc.*, 278 F. App'x 322, 329 (5th Cir. 2008) (per curiam) (finding "inappropriate" comments that were not "based on race" could not 'sustain a race-based hostile work environment claim").  More fundamentally, "'conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy' the nonmovant's burden in a motion for summary judgment."  *Ramsey*, 286 F.3d at 269 (quoting *Douglass v. United Servs. Auto. Ass'n*,

79 F.3d 1415, 1429 (5th Cir. 1996)) (finding insufficient evidence that alleged mistreatment was because of plaintiff's race).

The same is true of Hightower's claim that Gray engaged in race-based harassment by failing to act when Hightower complained about SW. The Court recognizes that same-race harassment can occur and support a viable hostile-work-environment claim. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79–80 (1998) (recognizing same-sex sexual-harassment claim). Thus, it is conceivable that Gray could harass a fellow African American based on race. But Hightower's argument that Gray failed to meet with and refused to discipline SW is not factually supported, and Hightower has otherwise failed to show that Gray harassed Hightower based on race. Again, there is no evidence of racial animus by Gray.

Hightower does say FHCC's failure to respond to her complaints regarding SW are like its failure to adequately respond when Dr. DH harassed Dr. Barnes, another Black doctor. Pl.'s Opp'n Mem. [171] at 51. Barnes testified in her deposition that DH once "pushed me out of the way" and that he had "a certain anger that . . . he would exhibit." Barnes Dep. [133-13] at 33, 36. But Barnes was DH's supervisor, and it is not apparent that Barnes complained of race-based harassment to Gray or anyone higher in the clinic. Barnes herself speculates that DH's general defiance may have been attributable to Barnes's *sex. Id.* at 33. This fails to show that Gray's handling of the SW issue was based on race, and it should be again noted that FHCC terminated DH's employment. Hightower must offer more than her subjective belief and speculation. *Eaton-Stephens*, 715 F. App'x at 356.[12]

---

[12] It also seems that failing to discipline SW is really part of the termination claim rather than harassment directed at Hightower, but even if it could be viewed as harassment, the racial nexus is missing.

Turning to Dr. RA's alleged hyper scrutiny, Hightower notes only that there "is no corresponding account of Dr. [RA] reporting on anyone else." Pl.'s Opp'n Mem. [171] at 13. But that, too, is incorrect; Hightower's record evidence includes RA's report against EE, a White doctor. *See* Report on RA-EE Conflict [157-39] at 1. And there is no dispute RA and EE clashed. Hightower has failed to show that RA's conduct toward Hightower reflects race-based harassment. So too, she has not shown that Gray's failure to address RA's conduct was based on Hightower's race.[13]

As for Hightower's compensation and termination from employment, assuming those discrete acts are properly considered with the harassment claim—which is not a given—the Court has already found that Hightower failed to establish the racial nexus for those employment actions. *See Baker*, 278 F. App'x at 329 (declining to consider transfer and termination from employment as part of hostile-work-environment claim because plaintiff failed to prove they were unlawful).

The final alleged act of harassment nudges a little closer to satisfying the causation issue but still falls short. Hightower claims that after Dr. EE reported a conflict with Hightower, CMO Curry told Hightower to "tuck her head" around EE. Pl.'s Opp'n Mem. [171] at 23. Hightower contends that the comment constitutes race-based harassment because EE is not Black. *Id.* Again, it is conceivable that Curry could harass a fellow African American for being African American. But there exists no evidence of racial animus by Curry, and the statement itself, viewed under the totality of the circumstances, does not necessarily imply a race-based motive.

---

[13] Like RA, Hightower reported other doctors, including multiple complaints about SW. *See* Pl.'s Opp'n Mem. [171] at 6; *see also* Curry Report [159-8] at 1 (discussing Hightower's complaints against SW regarding patient care).

In any event, assuming the statement could be viewed to reflect racial animus, it would be nothing more than a single "offhand comment[]," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), or "a mere offensive utterance," *Johnson*, 7 F.4th at 400 (quoting *Harris*, 510 U.S. at 23). The comment, even if it could be coupled with the SW incidents and other alleged acts, would be neither severe nor pervasive enough to alter the terms and conditions of employment.

Also, while not alone dispositive, Hightower claims that she remained the most productive doctor at the clinic, indicating that the alleged harassment did not alter the terms and conditions of employment. *See E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 400 (5th Cir. 2007) ("Whether [the plaintiff] lost sales as a result of the alleged harassment is certainly relevant to his hostile work environment claim; but it is not, by itself, dispositive"). "[T]he Supreme Court has 'made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment.'" *Montgomery-Smith v. George,* 810 F. App'x 252, 259 (5th Cir. 2020) (quoting *Faragher*, 524 U.S. at 788). The Court therefore considers whether the conduct "unreasonably interfere[d] with [Hightower's] work performance." *Harris*, 510 U.S. at 23. There is no sign of that here.

Finally, there is little doubt that conflict existed at FHCC. As noted, Hightower reported issues with Black, White, and Asian doctors. It is also clear that other doctors of various races clashed with each other. But the law does not exist to create a "general civility code" and does not protect employees from "the ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 788. Because Hightower has not created a genuine issue of fact as to a central element of her hostile-work-environment claim, it must be dismissed.

IV.     Conclusion

The Court has considered all arguments.  Those not addressed would not change the outcome.  FHCC's Motion for Summary Judgment [126] is granted.  That leaves three pending motions.  The first, Defendant's Motion to Limit Testimony [128], is denied as moot.  The two remaining motions [141 and 168] address issues related to the Protective Order [62].  Those motions are before the magistrate judge, but the Court has attempted to draft the present Order to avoid issues raised in those motions.  Once those motions are resolved, final judgment will be entered under Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED** this the 22nd day of March, 2022.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE